# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

SLEP-TONE ENTERTAINMENT
CORPORATION,
    Plaintiff,

v.

KARA-O-KING INC.; SOUNDS OF
STARDOM; JENNIFER A. APICELLA-
CAVAZZI; GARY M. CAVAZZI;
KENNETH KALINSKY; KARAOKE
MIAMI LLC; SING IT KARAOKE; BOBBI
PASCHALL; DONALD SHIRLEY; MUGS
N JUGS RESTAURANTS, LLC; MNJ II
LLC; JASON BUTLER; GOODTIME
KARAOKE INC.; BIG DOG KARAOKE;
KATHERINE L. SIMMONS; WILFRED J.
SIMMONS; RAYMOND B. LA VELLE;
CHRISTOPHER J. CLUTE; JADA
INVESTMENT GROUP INC.; BIG BOB'S
MUSIC MACHINE; ROBERT L.
PAYNTER, SR; ROBERT L. PAYNTER,
JR.; ERNEST V. GORAM, JR.; GARY J.
SONNAY; CHRISTIAN E. SIMPSON;
DANIEL C. KIRWIN; DALE DUNN;
CHRISTOPHER B. SJOKVIST; DUNN
DEAL ENTERTAINMENT;
CHRISTOPHER DUNN; JOSEPH A.
DUNN; ANTHONY GRIFFIN; DAVID
HARRIS; NIGHT AL PRODUCTIONS;
CHARLES A. MCCONNIEL; JAMES W.
GRANT; and J.A.M.S. ENTERTAINMENT
INC.,
    Defendants.

Civil Action No. 5:10cv00071

**<u>COMPLAINT</u>**

The Plaintiff, Slep-Tone Entertainment Corporation ("Slep-Tone"), by its undersigned counsel, complains of the Defendants and for its complaint alleges as follows:

## **INTRODUCTION**

Slep-Tone is the manufacturer and distributor of karaoke accompaniment tracks sold under the name "Sound Choice." Slep-Tone was founded 25 years ago by Kurt and Derek Slep, two brothers with a vision to nurture the development of karaoke in America as a participatory entertainment phenomenon. During that time, Sound Choice came to be recognized as one of the leading producers of high-quality karaoke accompaniment tracks. The company invested over $18 million to re-record and replicate the authentic sound of popular music across different eras and genres of music.

The Sleps' dedication to producing music of the highest quality and the most authentic character led its music to become the staple of almost every karaoke show in the country. As karaoke grew in popularity, Sound Choice became the brand that nearly every karaoke fan wanted to sing and that nearly every karaoke jockey ("KJ") wanted in his or her library.

KJs play karaoke songs using compact discs written in a special encoded format known as "CD+G" ("compact disc plus graphics"), in which the CD contains the music and the lyrics, which will display on a screen. In recent years,

2

computer technology, cheap file memory devices, and the internet have made it possible for CD+G discs to be decoded and "ripped" (copied) to a user's hard drive and easily copied and distributed between KJs.  This technology has proven irresistible to KJs, many of whom have used this opportunity to copy one purchased disc to several different computer based systems, copy a singer's personal discs if they use them during a show, "swap" song files among each other, download them from illegal file-sharing sites and build libraries of tens of thousands of karaoke songs without paying for them.  Whereas in the past a KJ would buy multiple copies of an original CD+G, now they simply "clone" their songs for multiple commercial systems or even their entire karaoke song libraries to start a new operation.   Additionally, many KJs or operators starting in the business simply buy computer drives pre-loaded with thousands of illegally copied songs.

These practices have become so widespread that Slep-Tone and its sister company, Sound Choice Studios, Inc., have been driven nearly out of business.  At its peak, the Sound Choice family of companies employed 75 individuals and produced as many as 5 new karaoke discs per month.  Today, the enterprise employs fewer than 10 individuals.  Sound Choice Studios, which is responsible for production of new material, has virtually ceased making new discs, because the companies have lost money on every recent new karaoke disc.  The most recent

new disc did not produce enough revenue even to cover the production and licensing costs associated with it—yet the songs from that disc can be found on as many as 30,000 karaoke systems around the United States.

For KJs, karaoke is a commercial enterprise. KJs who legitimately acquired all of their music at great cost are being forced by illicit competition to produce shows for lower and lower fees. Illegitimate competitors offer libraries of tens of thousands of songs, which would have cost $50,000 to $100,000 or more to acquire legitimately, but produce shows for one-third the rates a legitimate KJ can offer. The result is significant financial pressure on once-legitimate KJs to skirt or ignore the law and become pirates, simply to stay in business.

Slep-Tone has been forced to undertake this litigation in order to ensure that it survives and continues to produce the high-quality karaoke music its fans demand and to level the playing field for the legitimate KJs.

## <u>JURISDICTION AND VENUE</u>

1.  This is an action for trademark infringement and unfair competition arising under §§ 32 and 43 of the Trademark Act of 1946, 15 U.S.C. §§ 1114 and 1125. This Court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

2.     This Court further has jurisdiction pursuant to 28 U.S.C § 1338(a), in that this civil action arises under an Act of Congress relating to trademarks, and, as to the Plaintiff's Lanham Act unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark laws of the United States.

3.     This Court has supplemental jurisdiction over the subject matter of the Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a), in that those claims are so related to the Plaintiff's federal claims that they form part of the same case or controversy.

4.     Alternatively, this Court has jurisdiction over the subject matter of the Plaintiff's state-law claims pursuant to 28 U.S.C. § 1332(a), in that this is an action between citizens of different States, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because all of the defendants reside in this State, and at least one of the defendants resides in this judicial district.


## THE PLAINTIFF

6.     Plaintiff SLEP-TONE is a North Carolina corporation having its principal place of business at 14100 South Lakes Drive, Charlotte, North Carolina.

## THE DEFENDANTS

7.    Defendant KARA-O-KING INC. is a Florida corporation with its principal business address in Homestead, Florida.  Defendant KARA-O-KING INC. is engaged in the business of providing karaoke entertainment, and it conducts its business activities at numerous venues in this State.

8.    Defendant SOUNDS OF STARDOM is a general partnership whose general partners are, at least, Defendant JENNIFER A. APICELLA-CAVAZZI and Defendant GARY M. CAVAZZI, and which has its principal business address in Plantation, Florida.  Defendant SOUNDS OF STARDOM is engaged in the business of providing karaoke entertainment, and it conducts its business activities at numerous venues in this State.

9.    Defendant KENNETH KALINSKY is an individual who does business as "Rockin Ken Kay Entertainment" and who has his principal business address in Coral Springs, Florida.  Defendant KENNETH KALINSKY is engaged in the business of providing karaoke entertainment, and he conducts his business activities at numerous venues in this State.

10.    Defendant KARAOKE MIAMI LLC is a Florida limited liability company with its principal business address in Miami, Florida.  Defendant KARAOKE MIAMI LLC is engaged in the business of providing karaoke

entertainment, and it conducts its business activities at numerous venues in this State.

11.    Defendant SING IT KARAOKE is a business association of unknown type whose principals are, at least, Defendant BOBBI PASCHALL and Defendant DONALD SHIRLEY, and which has its principal business address in Miramar, Florida.

12.    In the alternative, Defendant BOBBI PASCHALL is an individual who does business as "Sing It Karaoke."

13.    In the further alternative, Defendant DONALD SHIRLEY is an individual who does business as "Sing It Karaoke."

14.    Regardless of the particular structure and form of ownership of "Sing It Karaoke," Defendants SING IT KARAOKE, BOBBI PASCHALL, and/or DONALD SHIRLEY is or are engaged in the business of providing karaoke entertainment, conducting their business activities in this State.

15.    Defendants MUGS N JUGS RESTAURANTS LLC and MNJ II LLC are Florida limited liability companies and related entities that have their principal business address at the same location in Clearwater, Florida.  Both Defendant MUGS N JUGS RESTAURANTS LLC and MNJ II LLC are engaged in the business of operating bar-restaurants in Clearwater and Port

Richey, Florida, at which karaoke entertainment services are provided using the Defendants' own equipment.

16. Defendant JASON BUTLER is an individual who does business as "Rock After Dark" and who has his principal place of business in Crystal Beach, Florida. Defendant JASON BUTLER is engaged in the business of providing karaoke entertainment, and he conducts his business activities at numerous venues in this State.

17. Defendant GOODTIME KARAOKE INC. is a Florida corporation with its principal place of business in Port Richey, Florida. Defendant GOODTIME KARAOKE INC. is engaged in the business of providing karaoke entertainment, and it conducts its business activities at numerous venues in this State.

18. Defendant BIG DOG KARAOKE is a general partnership whose general partners are, at least, Defendant KATHERINE L. SIMMONS and Defendant WILFRED J. SIMMONS, and which has its principal business address in Brooksville, Florida. Defendant BIG DOG KARAOKE is engaged in the business of providing karaoke entertainment, and it conducts its business activities at several venues in this State.

19. Defendant RAYMOND A. LA VELLE is an individual who does business as "High Voltage Entertainment" and who has his principal business address

8

in Spring Hill, Florida.  Defendant RAYMOND A. LA VELLE is engaged

in the business of providing karaoke entertainment, and he conducts his

business activities in this State.

20.    Defendant CHRISTOPHER J. CLUTE is an individual who does business as

"Killer Idol," who has his principal business address in Dunedin, Florida.

Defendant CHRISTOPHER J. CLUTE is engaged in the business of

providing karaoke entertainment, and he conducts his business activities at

several venues in this State.

21.    Defendant JADA INVESTMENT GROUP INC. is a Florida corporation that

does business as "Jumpin Jams Music & More" and "Vivid Media," with its

principal business address in Crawfordville, Florida.  Defendant JADA

INVESTMENT GROUP INC. is engaged in the business of providing

karaoke entertainment, and it conducts its business activities at several

venues in this State.

22.     Defendant BIG BOB'S MUSIC MACHINE is a business association of

unknown type whose principals are, at least, Defendant ROBERT L.

PAYNTER, SR. and Defendant ROBERT L. PAYNTER, JR., and which

has its principal business address in Tallahassee, Florida.

23.    In the alternative, Defendant ROBERT L. PAYNTER, SR. is an individual who does business as "Big Bob's Music Machine," who has his principal business address in Tallahassee, Florida.

24.    Regardless of the particular structure and form of ownership of "Big Bob's Music Machine," Defendants BIG BOB'S MUSIC MACHINE, ROBERT L. PAYNTER, SR., and ROBERT L. PAYNTER, JR., are engaged in the business of providing karaoke entertainment, conducting their business activities at several venues in this State.

25.    Defendant ERNEST V. GORAM, JR. is an individual who does business as "Goram Entertainment," who has his principal business address in Tallahassee, Florida.  Defendant ERNEST V. GORAM, JR. is engaged in the business of providing karaoke entertainment and conducts his business activities at several venues in this State.

26.    Defendant GARY J. SONNAY is an individual who does business as "MGM Sound Productions," with his principal business address in Holiday or Tarpon Springs, Florida.  Defendant GARY J. SONNAY is engaged in the business of providing karaoke entertainment and conducts his business activities at venues in this State.

27.    Defendant CHRISTIAN E. SIMPSON is an individual who does business as "DJ Lite Productions" and/or "Acapella Karaoke," with his principal

business address in Palm Harbor, Florida.  Defendant CHRISTIAN E.

SIMPSON is engaged in the business of providing karaoke entertainment

and conducts his business activities in this State.

28.    Defendant DANIEL C. KIRWIN is an individual who does business as "KJ

Danny K," with his principal business address in Port Richey, Florida.

Defendant DANIEL C. KIRWIN is engaged in the business of providing

karaoke entertainment and conducts his business activities at venues in this

State.

29.    Defendant DALE DUNN is an individual who does business as "KJ Cletus,"

with his principal business address in New Port Richey, Florida.  Defendant

DALE DUNN is engaged in the business of providing karaoke entertainment

and conducts his business activities in this State.

30.    Defendant CHRISTOPHER B. SJOKVIST is an individual with his

principal business address in Dunedin, Florida.  Defendant CHRISTOPHER

B. SJOKVIST is engaged in the business of providing karaoke entertainment

and conducts his business activities in this State.

31.    Defendant DUNN DEAL ENTERTAINMENT is a general partnership

whose general partners are, at least, Defendant CHRIS DUNN and

Defendant JOSEPH A. DUNN, with its principal business address in Tampa,

Florida.  Defendant DUNN DEAL ENTERTAINMENT is engaged in the

business of providing karaoke entertainment and conducts its business

activities at several venues in this State.

32. Defendant ANTHONY GRIFFIN is an individual who does business as

"Rockstar Karaoke & DJ Services," with his principal place of business in

New Port Richey, Florida. Defendant ANTHONY GRIFFIN is engaged in

the business of providing karaoke entertainment and conducts his business

activities in this State.

33. Defendant DAVID HARRIS is an individual who does business as "CPT

Dave," whose principal business address is in Saint Petersburg, Florida.

Defendant DAVID HARRIS is engaged in the business of providing karaoke

entertainment and conducts his business activities in this State.

34. Defendant NIGHT AL PRODUCTIONS is a business association of

unknown type whose principals are, at least, Defendant CHARLES A.

MCCONNIEL and Defendant JAMES W. GRANT, and which has its

principal business address in Panama City Beach, Florida.

35. In the alternative, Defendant CHARLES A. MCCONNIEL is an individual

who does business as "Night Al Productions."

36. In the further alternative, Defendant JAMES W. GRANT is an individual

who does business as "Night Al Productions."

37.    Regardless of the particular structure and form of ownership of "Night Al

Productions," Defendants NIGHT AL PRODUCTIONS, CHARLES A.

MCCONNIEL, and JAMES W. GRANT is or are engaged in the business of

providing karaoke entertainment, conducting their business activities in this

State.

38.    Defendant J.A.M.S. ENTERTAINMENT INC. is a Florida corporation

having its principal business address in Tampa, Florida.  Defendant J.A.M.S.

ENTERTAINMENT INC. is engaged in the business of providing karaoke

entertainment, and it conducts its business activities at several venues in this

State.


## BACKGROUND FACTS

39.    The term "karaoke" means "empty orchestra" in Japanese.  Karaoke

entertainment has grown into a multi-million dollar business in the United

States.

40.    Karaoke compact disc plus graphics ("CD+G") recordings contain re-created

arrangements of popular songs for use as "accompaniment tracks."

41.    Typically, the lead vocal tracks in an accompaniment track are omitted so

that a karaoke participant can sing along, as though he or she were the lead

singer.  In other situations, the lead vocal track by a sound-alike artist might

be included, and some formats allow the lead vocal to be selectively muted upon playback so that the accompaniment track may be listened to either with or without the lead vocals.

42. The "graphics" portion of a karaoke recording refers to the encoding of the recording with data to provide a contemporaneous video display of the lyrics to the song, in order to aid the performer.

43. This graphics data is also utilized to mark the accompaniment tracks with the Sound Choice trademarks and to cause the Sound Choice trademarks to be displayed upon playback.

44. Entertainers who provide karaoke services in bars, restaurants, and other venues are known as karaoke jockeys ("KJs"). The services provided by KJs typically include providing the karaoke music and equipment for playback, entertaining the assembled crowd for warm-up purposes, and organizing the karaoke show by controlling access to the stage, setting the order of performance, and operating the karaoke equipment.

45. Typically, a KJ will maintain a catalog of songs available for performance in order to aid participants in selecting a song to sing.

46. Legitimate KJs purchase equipment and tracks recorded in CD+G format and charge for the above-mentioned karaoke services.

47. Many KJs, such as some of the present Defendants, obtain, copy, share, distribute and/or sell media-shifted copies of the accompaniment tracks via pre-loaded hard drives, USB drives, CD-R's, or the Internet.

48. Neither SLEP-TONE nor any of its associated company has ever authorized the digitization of its songs for commercial use in producing karaoke shows.

49. SLEP-TONE tolerates, but does not authorize, the shifting of its accompaniment tracks from the original CD+G medium to another medium, such as a computer hard drive, provided that the KJ strictly follows SLEP-TONE's media-shifting policy by maintaining "one-to-one correspondence."

50. "One-to-one correspondence" requires (1) that each track stored on an alternative medium have originated from an original Sound Choice CD+G; (2) that the tracks from the original Sound Choice CD+G be shifted to one, and only one, alternative medium at a time; (3) that the KJ maintain ownership of the original Sound Choice CD+G while its content is shifted to the alternative medium; and (4) that the original Sound Choice CD+G not be used for any commercial purpose while its content is shifted to the alternative medium.

51. The copying, sharing, distribution, and selling of media-shifted copies is not accompanied by the payment of any royalty to SLEP-TONE, nor authorized by any license agreement.

52. SLEP-TONE and its affiliated companies pay statutory and negotiated royalties to the owners of copyright in the underlying musical works for their activities in legitimately creating, copying, distributing, and selling CD+Gs and/or recordings in other formats.

53. Those persons, including the Defendants, who illegitimately obtain, copy, share, distribute, and/or sell media-shifted copies of the Plaintiff's accompaniment tracks do not pay royalties to the owners of copyright in the underlying musical works.

54. SLEP-TONE and its affiliated companies have spent millions of dollars building and maintaining studios, hiring artists, building a distribution facility, paying royalties to copyright owners, building a company that is capable of reliably producing high-quality karaoke versions of current and historical musical hits, and building a brand that is one of the pre-eminent brands in the industry.

55. The widespread creation of counterfeit copies of SLEP-TONE's karaoke discs in CD+G and other formats has denied SLEP-TONE the benefit of its investments.

56. These counterfeits include SLEP-TONE's registered trademarks, such that to the consumers of the illegitimate KJs' services, the counterfeits are virtually indistinguishable from genuine Sound Choice materials.

57.   For each of the several recent releases of new karaoke music by SLEP-TONE, dozens of illegitimate copies of the contents of CD+G have been created, on average, for each legitimate copy sold.  SLEP-TONE, its affiliated companies, and its licensors have lost a considerable amount of money due to this widespread piracy.

58.   Such widespread illegal copying of music has been made possible by improving and ever cheaper computer technology and memory devices and the easy distribution of digital content over the internet.

59.   Widespread pirating of songs has contributed to the loss of more than sixty jobs at the Plaintiff's location in Charlotte, North Carolina, as well as several consecutive years of operating losses, as revenues do not cover fixed costs.

60.   Legitimate KJs spend thousands of dollars acquiring SLEP-TONE's accompaniment tracks, an irreducible overhead cost that must be recovered over a significant number of engagements.

61.   Illegitimate KJs, who acquire the songs in their libraries illegally, have an unfair advantage over legitimate KJs, because the illegitimate KJs are able to provide karaoke services with a considerably lower overhead cost and significantly more songs through the pirating of SLEP-TONE's tracks.

62.   Piracy therefore unfairly increases the profits of illegitimate KJs and unfairly decreases the profits of legitimate KJs, a condition that pressures legitimate

KJs to either commit piracy instead of doing business with SLEP-TONE and

other karaoke music producers or lose their shows to KJs offering more

songs at cheaper prices to the same venues.

63.    Because of piracy, it is nearly impossible for legitimate KJs to compete

against illegal KJs, who are able to provide less expensive karaoke services

and a greater number of tracks due to their lower overhead costs.


## THE RIGHTS OF THE PLAINTIFF

64.    Plaintiff SLEP-TONE is the owner of U.S. Trademark Registration No.

1,923,448 for the trademark SOUND CHOICE.

65.    Plaintiff SLEP-TONE is also the owner of U.S. Trademark Registration No.

2,000,725, for a display trademark as follows:



66.    Plaintiff SLEP-TONE has, for the entire time its marks ("the Sound Choice

Marks") have been federally registered, provided the public, including the

Defendants, with notice of its federal registrations through the consistent

display of the symbol ® with its marks as used.

## INVESTIGATION OF THE DEFENDANTS'ACTIVITIES

67.    SLEP-TONE's investigators observed each of the Defendants possessing, using, or authorizing or benefiting from unauthorized counterfeit copies of at least one work bearing the Sound Choice Marks.

68.    Defendant KARA-O-KING INC. was observed operating karaoke systems to produce shows at three different venues in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

69.    In connection with those shows, Defendant KARA-O-KING INC. repeatedly displayed the Sound Choice Marks without right or license.

70.    Defendant KARA-O-KING INC. has advertised that it puts on at least 37 separate karaoke shows at as many as 26 different venues per week, as many as 10 simultaneously.

71.    Defendant KARA-O-KING INC. has advertised that it maintains a library of more than 100,000 songs stored on each of its karaoke systems.

72.    Defendant SOUNDS OF STARDOM was observed operating karaoke systems to produce shows at four different venues in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

73.    In connection with those shows, Defendant SOUNDS OF STARDOM repeatedly displayed the Sound Choice Marks without right or license.

19

74. Defendant SOUNDS OF STARDOM has put on as many as 11 separate shows per week at as many as eight different venues, as many as three simultaneously.

75. Defendant SOUNDS OF STARDOM has advertised that it maintains a library of more than 40,000 songs stored on each of its karaoke systems, and that it hosts more than 500 shows annually.

76. Defendant SOUNDS OF STARDOM offers commercially to provide sound recordings of singing patrons, in compact disc form, using their counterfeit SOUND CHOICE accompaniment tracks.

77. Defendant KENNETH KALINSKY was observed operating karaoke systems to produce shows at two different venues in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

78. In connection with those shows, Defendant KENNETH KALINSKY repeatedly displayed the Sound Choice Marks without right or license.

79. Defendant KENNETH KALINSKY has put on as many as nine shows per week at as many as eight different venues, as many as three simultaneously.

80. Defendant KENNETH KALINSKY has advertised that he maintains a library of 200,000 karaoke songs stored on each of its karaoke systems.

81.   Defendant KENNETH KALINSKY has sold and continues to offer for sale computer hard drives containing counterfeit copies of SLEP-TONE's accompaniment tracks bearing the Sound Choice Marks.

82.   Defendant KARAOKE MIAMI LLC was observed operating a karaoke system to produce a show at a venue in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

83.   In connection with that show, Defendant KARAOKE MIAMI LLC repeatedly displayed the Sound Choice Marks without right or license.

84.   Defendant KARAOKE MIAMI LLC has put on as many as 11 shows per week at as many as eight different venues, as many as three simultaneously.

85.   Defendant KARAOKE MIAMI LLC maintains a library in excess of 33,000 songs stored on each of its karaoke systems.

86.   Defendant SING IT KARAOKE, or its associated principal, was observed operating a karaoke system to produce a show at a venue in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

87.   In connection with that show, Defendant SING IT KARAOKE repeatedly displayed the Sound Choice Marks without right or license.

88.   Defendant SING IT KARAOKE advertises that it has a "huge library of songs" and that it is "CDG capable," indicating that it does not primarily

21

operate from CD+Gs, but is capable of playing a customer-supplied CD+G if asked to do so.

89. Defendants MUGS N JUGS RESTAURANTS, LLC and MNJ II LLC were observed to operate karaoke systems to produce shows at the restaurants they operate in this state, in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

90. In connection with their shows, Defendants MUGS N JUGS RESTAURANTS, LLC and MNJ II LLC repeatedly displayed the Sound Choice Marks without right or license.

91. Defendants MUGS N JUGS RESTAURANTS, LLC and MNJ II LLC advertise the performance of karaoke shows at their two bar-restaurants on a nightly basis.

92. Defendants MUGS N JUGS RESTAURANTS, LLC and MNJ II LLC maintain libraries in excess of 19,000 songs stored on their karaoke systems.

93. Defendant JASON BUTLER was observed operating karaoke systems to produce shows at two different venues in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

94. In connection with those shows, Defendant JASON BUTLER repeatedly displayed the Sound Choice Marks without right or license.

95.   Defendant JASON BUTLER has put on as many as eight shows per week at as many as six different venues, as many as two simultaneously.

96.   Defendant JASON BUTLER maintains a library in excess of 19,000 songs stored on each of his karaoke systems.

97.   Defendant GOODTIME KARAOKE INC. was observed operating a karaoke system to produce a show at a venue in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

98.   In connection with that show, Defendant GOODTIME KARAOKE INC. repeatedly displayed the Sound Choice Marks without right or license.

99.   Defendant GOODTIME KARAOKE INC. has put on as many as eight shows per week at as many as five different venues, as many as three simultaneously.

100.  Defendant GOODTIME KARAOKE INC. maintains a library in excess of 12,000 songs stored on each of its karaoke systems.

101.  Defendant BIG DOG KARAOKE was observed operating a karaoke system to produce a show at a venue in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

102.  In connection with that show, Defendant BIG DOG KARAOKE repeatedly displayed the Sound Choice Marks without right or license.

103. Defendant BIG DOG KARAOKE has put on as many as three separate shows per week at as many as three different venues using its karaoke system.

104. Defendant BIG DOG KARAOKE has advertised that it maintains a library in excess of 220,000 songs stored on its karaoke system.

105. Defendant RAYMOND B. LA VELLE was observed operating a karaoke system to produce a show at a venue in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

106. In connection with that show, Defendant RAYMOND B. LA VELLE repeatedly displayed the Sound Choice Marks without right or license.

107. Defendant RAYMOND B. LA VELLE puts on two shows weekly at a venue and, upon information and belief, offers and provides his services commercially for private engagements using the same system.

108. Defendant RAYMOND B. LA VELLE maintains a library in excess of 62,000 songs stored on his karaoke system.

109. Defendant CHRISTOPHER J. CLUTE was observed operating a karaoke system to produce a show at a venue in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

110. In connection with that show, Defendant CHRISTOPHER J. CLUTE repeatedly displayed the Sound Choice Marks without right or license.

111.  Defendant CHRISTOPHER J. CLUTE has put on as many as four separate
      karaoke shows at as many as three karaoke venues using his karaoke system.

112.  Defendant CHRISTOPHER J. CLUTE maintains a library in excess of
      50,000 songs stored on his karaoke system.

113.  Upon information and belief, Defendant CHRISTOPHER J. CLUTE offers
      commercially to provide counterfeit copies of SOUND CHOICE
      accompaniment tracks, in compact disc or DVD form, to patrons at his
      shows.

114.  Defendant JADA INVESTMENT GROUP INC. was observed operating a
      karaoke system to produce a show at a venue in this State in which
      counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

115.  In connection with that show, Defendant JADA INVESTMENT GROUP
      INC. repeatedly displayed the Sound Choice Marks without right or license.

116.  Defendant JADA INVESTMENT GROUP INC. puts on both public shows
      at commercial venues and private shows for paying customers using its
      karaoke system.

117.  Defendant JADA INVESTMENT GROUP INC. maintains a library in
      excess of 100,000 songs stored on its karaoke system.

118.  Upon information and belief, Defendant JADA INVESTMENT GROUP
      INC. offers commercially to provide counterfeit copies of SOUND CHOICE

accompaniment tracks, in compact disc or DVD form, to patrons at his shows.

119.  Defendant BIG BOB'S MUSIC MACHINE, or its associated principal, was observed operating a karaoke system to produce a show at a venue in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

120.  In connection with that show, Defendant BIG BOB'S MUSIC MACHINE repeatedly displayed the Sound Choice Marks without right or license.

121.  Defendant BIG BOB'S MUSIC MACHINE possesses and commercially uses two computer hard drive-based karaoke systems bearing identical content, and maintains a library in excess of 53,000 songs stored on its karaoke systems.

122.  Defendant BIG BOB'S MUSIC MACHINE has put on at least three karaoke shows per week at as many as three different venues using its karaoke systems.

123.  Defendant ERNEST V. GORAM, JR. was observed operating a karaoke system to produce a show at a venue in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

124.  In connection with that show, Defendant ERNEST V. GORAM, JR. repeatedly displayed the Sound Choice Marks without right or license.

125.  Defendant ERNEST V. GORAM, JR. has put on karaoke shows at as many as four separate venues per week, as many as three of them simultaneously.

126.  A representative of Defendant ERNEST V. GORAM, JR., Roger Goram, operated the show observed by SLEP-TONE's investigator.  Roger Goram stated, in response to an inquiry from SLEP-TONE's investigator regarding the number of songs available to sing, that "I got everything," meaning that his karaoke system contained substantially all of the karaoke recordings in existence.

127.  Defendant GARY J. SONNAY was observed operating a karaoke system to produce a show at a venue in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

128.  In connection with that show, Defendant GARY J. SONNAY repeatedly displayed the Sound Choice Marks without right or license.

129.  Defendant GARY J. SONNAY has put on karaoke shows at least twice per week using his karaoke system.

130.  Defendant GARY J. SONNAY advertises that he maintains a library in excess of 125,000 songs stored on his karaoke system.

131.  Defendant CHRISTIAN E. SIMPSON was observed operating a karaoke system to produce a show at a venue in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

132.  In connection with that show, Defendant CHRISTIAN E. SIMPSON repeatedly displayed the Sound Choice Marks without right or license.

133.  Defendant CHRISTIAN E. SIMPSON also repeatedly played SLEP-TONE accompaniment tracks in a partially "chopped" format.

134.  "Chopping" is a practice undertaken by karaoke pirates in an attempt to hide their piracy by excising the musical intro or outro portion of an accompaniment track in order to prevent the manufacturer's logo from being displayed.  Chopping is a strong indicator that an accompaniment track has been obtained from an illicit source.

135.  The partially "chopped" format utilized by Defendant CHRISTIAN E. SIMPSON did not entirely prevent the Sound Choice Marks from being displayed.

136.  Defendant CHRISTIAN E. SIMPSON maintains a library in excess of 50,000 songs stored on his karaoke system.

137.  Defendant DANIEL C. KIRWIN was observed operating a karaoke system to produce a show at a venue in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

138.  In connection with that show, Defendant DANIEL E. KIRWIN repeatedly displayed the Sound Choice Marks without right or license.

139. Defendant DANIEL E. KIRWIN has put on karaoke shows at least twice per week using his karaoke system.

140. Defendant DANIEL E. KIRWIN advertises that he maintains a library in excess of 150,000 songs stored on his karaoke system, and expressly states that he has "no CD's" [*sic*].

141. Defendant DALE DUNN was observed operating a karaoke system to produce a show at a venue in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

142. In connection with that show, Defendant DALE DUNN repeatedly displayed the Sound Choice Marks without right or license.

143. Defendant DALE DUNN has put on karaoke shows at least twice per week using his karaoke system.

144. Defendant DALE DUNN maintains a library in excess of 30,000 songs stored on his karaoke system.

145. Defendant CHRISTOPHER B. SJOKVIST was observed operating a karaoke system to produce a show at a venue in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

146. In connection with that show, Defendant CHRISTOPHER B. SJOKVIST repeatedly displayed the Sound Choice Marks without right or license.

147.  Defendant CHRISTOPHER B. SJOKVIST maintains a library in excess of 70,000 songs stored on his karaoke system.

148.  Defendant DUNN DEAL ENTERTAINMENT was observed operating a karaoke system to produce a show at a venue in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

149.  In connection with that show, Defendant DUNN DEAL ENTERTAINMENT repeatedly displayed the Sound Choice Marks without right or license.

150.  Defendant DUNN DEAL ENTERTAINMENT also repeatedly played SLEP-TONE accompaniment tracks in a partially "chopped" format.

151.  The partially "chopped" format utilized by Defendant DUNN DEAL ENTERTAINMENT did not entirely prevent the Sound Choice Marks from being displayed.

152.  Defendant DUNN DEAL ENTERTAINMENT has put on regular karaoke shows at as many as three different venues in this State.

153.  Defendant ANTHONY GRIFFIN was observed operating a karaoke system to produce a show at a venue in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

154.  In connection with that show, Defendant ANTHONY GRIFFIN repeatedly displayed the Sound Choice Marks without right or license.

155. Defendant ANTHONY GRIFFIN maintains two separate karaoke systems, each bearing the same content, and uses those systems to play public shows at commercial venues as well as private engagements.

156. Defendant ANTHONY GRIFFIN has advertised that he maintains a library of more than 28,000 songs stored on each of his karaoke systems.

157. Defendant DAVID HARRIS was observed operating a karaoke system to produce a show at a venue in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

158. In connection with that show, Defendant DAVID HARRIS repeatedly displayed the Sound Choice Marks without right or license.

159. Defendant DAVID HARRIS also played some SLEP-TONE accompaniment tracks in a partially "chopped" format.

160. The partially "chopped" format utilized by Defendant DAVID HARRIS did not entirely prevent the Sound Choice Marks from being displayed.

161. Defendant NIGHT AL PRODUCTIONS, or one or more of its associated principals, was observed operating a karaoke system to produce a show at a venue in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

162.  In connection with that show, Defendant NIGHT AL PRODUCTIONS, or one or more of its associated principals, repeatedly displayed the Sound Choice Marks without right or license.

163.  Defendant NIGHT AL PRODUCTIONS regularly puts on karaoke shows simultaneously at two separate venues, indicating ownership of at least two karaoke systems.

164.  Defendant NIGHT AL PRODUCTIONS has advertised a library of more than 75,000 songs stored on each of his karaoke systems.

165.  Defendant J.A.M.S. ENTERTAINMENT INC. was observed operating a karaoke system to produce a show at a venue in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

166.  In connection with that show, Defendant J.A.M.S. ENTERTAINMENT INC. repeatedly displayed the Sound Choice Marks without right or license.

167.  Defendant J.A.M.S. ENTERTAINMENT INC. puts on both public shows at commercial venues and private shows for paying customers using its karaoke systems.

168.  Defendant J.A.M.S. ENTERTAINMENT INC. has put on as many as 12 public karaoke shows per week, at as many as 8 different public venues, using as many as four separate karaoke systems.

169.  Defendant J.A.M.S. ENTERTAINMENT INC. regularly puts on in excess
      of 800 karaoke shows annually, including private-party performances.

170.  Defendant J.A.M.S. ENTERTAINMENT INC. maintains a library in excess
      of 30,000 songs stored on each of its karaoke systems.

171.  The use of counterfeit music bearing the Sound Choice Marks by each of the
      Defendants is a regular act that has been repeated numerous times over a
      period of months or years and is not an isolated or transient occurrence.

172.  Based upon the popularity of SLEP-TONE's music and the size of the
      Defendants' respective libraries, which vary between 12,000 and 220,000
      songs, operating in many cases with multiple karaoke systems, the Plaintiff
      has a good-faith belief that discovery will show that each of the Defendants
      who operates a karaoke system for his, her, or its own account is in
      possession of unauthorized counterfeit copies of the Plaintiff's karaoke
      discs, primarily in media-shifted format, which are marked with the Sound
      Choice Marks.

173.  Although the Defendants are not specifically alleged to have acted in concert
      with each other, all of them are committing acts of infringement and unfair
      competition and deceptive and unfair trade practices in substantially the
      same way, such that the right to relief asserted against them severally arises

out of the same series of transactions and occurrences, and this action raises

substantial questions of law and fact common to all of the defendants hereto.

## FIRST CLAIM FOR RELIEF
## TRADEMARK INFRINGEMENT

174.    Plaintiff SLEP-TONE realleges each and every allegation set forth in the

foregoing paragraphs, as though fully set forth herein, and incorporates them

herein by reference.

175.    Each of the Defendants used, or authorized or directly benefited from the use

of, a reproduction, counterfeit, or copy of the Sound Choice Marks in

connection with the provision of services including karaoke services, by

manufacturing or acquiring the reproduction, counterfeit, or copy of the

Sound Choice Marks and by displaying the reproduction, counterfeit, or

copy of the Sound Choice Marks during the provision of those services.

176.    The Defendants' use of the Sound Choice Marks was "in commerce" within

the meaning of the Trademark Act of 1946 as amended.

177.    Plaintiff SLEP-TONE did not license any of the Defendants to manufacture

or acquire reproductions, counterfeits, or copies, or to use the Sound Choice

Marks in connection with the provision of their services.

178.    The Defendants' use of the Sound Choice Marks is likely to cause

confusion, or to cause mistake, or to deceive the Defendants' customers and

patrons into believing that the Defendants' services are being provided with

the authorization of the Plaintiff and that the Defendants music libraries

contain bona fide Sound Choice accompaniment tracks.

179.  The acts of each of the Defendants were willful.

180.  Unless enjoined by the Court, the Defendants' infringing activities as

described above will continue unabated and will continue to cause harm to

the Plaintiff.

## SECOND CLAIM FOR RELIEF
## UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)

181.  Plaintiff SLEP-TONE realleges each and every allegation set forth in the

foregoing paragraphs, as though fully set forth herein, and incorporates them

herein by reference.

182.  On each occasion when they caused a SLEP-TONE accompaniment track to

be played during a karaoke show, the Defendants displayed the Sound

Choice Marks in connection with the Defendants' karaoke services.

183.  The display of the Sound Choice Marks is likely to cause confusion, or to

cause mistake, or to deceive those present during the display, in that those

present are likely to be deceived into believing, falsely, that SLEP-TONE

sponsored or approved the Defendants' services and commercial activities.

184.   The display of the Sound Choice Marks is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by SLEP-TONE and purchased by the Defendants.

185.   The Defendants' use of the Sound Choice Marks in this fashion would have inured to the benefit of the Plaintiff if the Defendants had legitimately acquired genuine Sound Choice discs instead of counterfeiting them or acquiring counterfeit copies, in that the Plaintiff would have received revenue from such sales.

186.   Because SLEP-TONE has been denied this revenue, it has been damaged by the Defendants' uses.

187.   Unless enjoined by the Court, the Defendants' unfair competition activities as described above will continue unabated and will continue to cause harm to the Plaintiff.

## THIRD CLAIM FOR RELIEF
## DECEPTIVE AND UNFAIR TRADE PRACTICES
## UNDER FLA. STAT. § 501.211

188.   Plaintiff SLEP-TONE realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein, and incorporates them herein by reference.

189.  Each Defendant has engaged in acts of infringement of the Sound Choice
      Marks, in derogation of SLEP-TONE's common-law and statutory rights in
      those marks.

190.  Each Defendant's acts of infringement occurred during the conduct of trade
      or commerce.

191.  Each Defendant's acts of infringement constitute deceptive or unfair trade
      practices within the meaning of Fla. Stat. § 501.204(1) (2009).

192.  As a direct and proximate result of each Defendant's acts of infringement,
      SLEP-TONE has suffered a pecuniary loss, to wit:  the loss of revenue
      associated with sales of CD+G discs to karaoke jockeys, commensurate with
      the demand for the contents of those discs, which revenue would have been
      received but for the Defendants' acts in creating or acquiring counterfeits of
      SLEP-TONE's accompaniment tracks.

193.  As such, SLEP-TONE is an aggrieved person within the meaning of Fla.
      Stat. § 501.211(1) (2009).


## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff SLEP-TONE prays for judgment against each of the the

Defendants severally and that the Court:

A.    Find that each of the Defendants has committed acts of infringement, including but not limited to counterfeiting, of the federally registered Sound Choice Marks;

B.    Find that each of the Defendants has engaged in unfair competition against Plaintiff SLEP-TONE in violation of 15 U.S.C. § 1125(a);

C.    Find that each of the Defendants has committed deceptive and unfair trade practices under Florida law;

D.    Enter judgment against each of the Defendants and in favor of SLEP-TONE;

E.    Find the that Defendants' activities were in all respects conducted willfully and for profit;

F.    Award to SLEP-TONE the Defendants' profits and the damages sustained by SLEP-TONE because of the Defendants' conduct in infringing the Sound Choice Marks, or, in the alternative, statutory damages per trademark infringed by counterfeiting;

G.    Award to SLEP-TONE the Defendants' profits and the damages sustained by SLEP-TONE because of the Defendants' acts of unfair competition under 15 U.S.C. § 1125(a);

H.    Award to SLEP-TONE treble, punitive, or otherwise enhanced damages, as available, for the Defendants' acts of willful infringement;

I.    Award to SLEP-TONE its actual damages caused by the Defendants'

deceptive and unfair trade practices, plus its attorney's fees and court costs

as provided in Fla. Stat. § 501.2105 (2009).

J.    Order the seizure of all computer disks, drives, or other media belonging to

any of the Defendants, which media contain illegal counterfeits of registered

trademarks;

K.    Grant SLEP-TONE preliminary and permanent injunctive relief against

further infringement of the Sound Choice Marks by the Defendants;

L.    Award SLEP-TONE its costs of suit and attorney's fees, to the extent not

awarded above; and

M.    Grant SLEP-TONE such other and further relief as justice may require.

Respectfully submitted this the 2nd day of April, 2010.

**HARRINGTON CIPRIANI LLP**

By:    s/James M. Harrington
James M. Harrington
N.C. State Bar No. 30005
jharrington@hprac.com
*Attorney for the Plaintiff*

HARRINGTON CIPRIANI LLP
10130 Mallard Creek Road, Suite 110
Charlotte, North Carolina 28262-6001
Telephone:  704-315-5800
Facsimile:  704-625-9259